**FILED**

FEB 1 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

M. C. DIXON LUMBER COMPANY, INC., )
605 West Washington Street )
Eufala, Alabama 36027 )
                )
    Plaintiff, )
                )
v. )
                )
CSX TRANSPORTATION, INC., BNSF )
RAILWAY COMPANY, UNION PACIFIC )
RAILROAD COMPANY, NORFOLK )
SOUTHERN RAILWAY COMPANY, )
and KANSAS CITY SOUTHERN )
RAILWAY COMPANY, )
                )
    Defendants. )

Case: 1:08-cv-00281
Assigned To : Friedman, Paul L.
Assign. Date : 2/15/2008
Description: Antitrust

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

M. C. Dixon Lumber Company, Inc. ("M. C. Dixon"), individually and on behalf of a class of all those similarly situated, states the following as its Complaint.

### NATURE OF THE ACTION

1. Plaintiff brings this action on behalf of itself and an alleged class of direct purchasers who purchased unregulated rail freight transportation services from Defendants and their co-conspirators from July 1, 2003 to the present, and who were assessed a rail fuel surcharge for the agreed-on transportation. As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law. Defendants collectively control over 90 percent of the rail freight traffic in the United States.

2. During the Class Period, defendant railroads conspired to fix, raise, maintain, or

1

stabilize prices of rail freight transportation services sold in the United States through use of rail fuel surcharges added to customers' bills. A rail fuel surcharge ("Rail Fuel Surcharge") is a separately-identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel. Throughout the Class Period, Defendants maintained uniformity of prices in Rail Fuel Surcharges by computing the surcharges as a percentage of the rail freight transport base rate and by agreeing upon common indices and trigger points for adjusting the percentages monthly. Defendants publish their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing.

3. As a direct and proximate result of this price-fixing conspiracy, Defendants have restrained competition in the market for unregulated rail freight transportation services and injured Plaintiff and each Class member in their business and property. Plaintiff and the members of the Class each have paid a higher price for unregulated rail freight transportation than they would have paid absent the concerted unlawful activity alleged herein.

4. Plaintiff seeks damages on behalf of itself and the Class for Rail Fuel Surcharges imposed on rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law. Plaintiff does not seek, on behalf of itself or the Class, damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

## PARTIES

5. Plaintiff M. C. Dixon ("Plaintiff") is an Alabama corporation operating a lumber business.  M. C. Dixon's principal place of business is 605 West Washington Street, Eufaula,

2

Alabama 36027.

6. M. C. Dixon purchased unregulated rail freight transportation directly from Norfolk Southern Railway Company and CSX Transportation, Inc. during the Class Period. M. C. Dixon paid the Rail Fuel Surcharges that form the basis of this action to Norfolk Southern and CSX, which surcharges were made possible by the price-fixing conspiracy outlined below. As such, M. C. Dixon makes a claim against all Defendants herein. The prices Plaintiff paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Plaintiff would have paid absent the conspiracy alleged herein. Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations.

7. Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States.

8. Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.

9. Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a wholly owned subsidiary of the Burlington Northern Santa Fe Corporation, the holding company formed by the September 22,

3

1995 merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states.

10. Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country, including the District of Columbia.

11. Defendant Kansas City Southern Railway Company ("KCS") has its principal place of business at 427 W. 12th St., Kansas City, Missouri 64105. KCS operates a major freight railroad in ten central and southeastern states.

## JURISDICTION AND VENUE

12. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys fees from Defendants for the injuries sustained by Plaintiff and members of the Class by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

13. Jurisdiction of this Court is founded on 15 U.S.C. §15, and 28 U.S.C. §§ 1331 and 1337.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1407, and J.P.M.L. Rule 7.5. On November 6, 2007, the Judicial Panel on Multidistrict Litigation transferred thirteen actions concerning the assessment of rail fuel surcharges to this Court pursuant to 28 U.S.C. § 1407. Pursuant to J.P.M.L. Rule 7.5, this action, making similar allegations against the same defendants, may be filed directly in the transferee court.

## CLASS ACTION ALLEGATIONS

15. Plaintiff brings this action as a class action under Rules 23(a), (b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and others similarly situated. The "Class" is defined as:

> All purchasers of rail freight transportation services from Defendants, through use of private railroad-shipper contracts or otherwise exempt from rate regulation under federal law, to which Defendants assessed a Rail Fuel Surcharge, from July 2003 to the present (the "Class Period"). Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint.

16. The Class is so numerous that joinder of all members is impracticable. Given the magnitude of the commerce involved, the members of the Class are geographically dispersed, and joinder of all class members would be impracticable. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff believes that there are, at a minimum, thousands of members of the Class and that their identities can be readily ascertained from Defendants' books and records.

17. Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and all members of the Class directly purchased unregulated rail freight transportation from Defendants, with respect to which Defendants imposed the artificially inflated Rail Fuel Surcharges established and maintained by the actions of Defendants in connection with the restraint of trade alleged herein. Plaintiff and the members of the Class have all sustained damage in that they paid inflated prices for the unregulated rail freight transportation services at issue as a result of Defendants' conduct in violation of federal law.

18. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and antitrust litigation.

19. Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether Defendants conspired, contracted or combined with others and each other, for the purpose of and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services purchased by the Class;

b. Whether Defendants undertook actions to conceal the unlawful conspiracies alleged herein;

c. Whether Defendants' conduct violated the federal antitrust laws; and

d. Whether Defendants' conduct caused injury to the business and property of Plaintiff and the Class and, if so, the proper measure of damages.

20. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

6

21. The interests of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a strong and pervasive community of interest, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. No difficulty is anticipated in the management of this action as a class action.

## INTERSTATE TRADE AND COMMERCE

22. During the Class Period, Defendants accounted for over 90 percent of all rail shipments within the United States. The US market for rail transportation services is estimated at more than $51 billion in 2006.

23. By definition, interstate rail shipments affect interstate commerce.

## DEREGULATION OF THE RAILROAD INDUSTRY

24. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980. The effect of this legislation was that after decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

25. Prior to the Staggers Act, the Interstate Commerce Commission ("ICC") prohibited railroads from charging rates different from those contained in published tariffs filed by the railroads with the ICC. Today, however, 80 percent or more of all rail shipments are exempt from rate regulation or move under private transportation contracts, which are likewise free of rate regulation.

26. Since 1980, the number of Class I railroads has declined to just seven. Five of these

7

railroads—the Defendants in this case—operate more than 90 percent of all railroad track in the United States.

27. Rail freight shippers across the nation are being subjected to an endless string of rate increases by railroads made possible by a concentrated market structure, tight capacity, and coordinated pricing. After deregulation, the railroads have taken advantage of these business conditions by collectively charging shippers supracompetitive rates.

28. The railroad industry today does not behave like a competitive market at all. Instead, it is dominated by the Defendants in this case.

## THE RAILROADS INTRODUCE FUEL SURCHARGES

29. Since passage of the Staggers Act in 1980, railroads had increasingly entered into transportation contracts with cost escalation provisions often tied to the "Rail Cost Adjustment Factor" ("RCAF"). The RCAF was published by the Association of American Railroads ("AAR"), the industry trade association, and included fuel prices as a component of the cost escalation. In the fourth quarter 2002, the AAR – which is controlled by the major Class I railroads – published, for the first time, a RCAF without the cost of fuel as a factor. This was not done by accident or mistake. It was a conscious decision by the AAR to remove fuel costs from the RCAF index so that Defendants, which controlled the AAR, could begin assessing separate Rail Fuel Surcharges and coordinating that practice.

30. Following publication of the "RCAF index without fuel," Defendants seized the opportunity and began to apply a Rail Fuel Surcharge as a separate item on the shipper's bill. When the price of oil began to rise dramatically in late 2003 and early 2004, Defendants began to see that they could use monthly changes to the fuel surcharge as an easy way to dramatically

increase their revenues without having to renegotiate individual contracts or wait for new rail capacity to come on line to meet growing demand – so long as all the Defendants participated and did not undercut each other.

## DEFENDANTS' PRICE-FIXING CONSPIRACY

31. Commencing in or about July 2003 or earlier, Defendants agreed to stop competing with one another with respect to prices they charged rail shippers and customers for carload shipments. The key element of this price-fixing conspiracy was an agreement by Defendants to act in concert with one another in demanding the Rail Fuel Surcharges from rail shippers and customers. Pursuant to this conspiracy, Defendants all agreed to apply Rail Fuel Surcharges computed as a percentage of the base rail freight rate (i.e., revenue), rather than as a percentage of the actual cost of fuel consumption associated with the individual movement to which the surcharge was applied.

32. Such a "revenue-based" fuel surcharge bore no direct relationship to Defendants' actual increase in fuel costs. Defendants have acknowledged that their fuel surcharge program is not a cost recovery mechanism, but a revenue enhancement measure intended to achieve across-the-board increases in the prices charged by Defendants for unregulated rail freight transportation.

33. Defendants implemented their agreement by exchanging information both in private and by publicly announcing agreed-upon surcharge increases and posting the monthly fuel surcharge percentages on their websites. They did so for purposes of monitoring and enforcing the agreed-upon Rail Fuel Surcharge levels.

34. As a result of Defendants' concerted action, prices of Rail Fuel Surcharges charged

to rail shippers and customers (members of the Class) were raised to or maintained at supracompetitive levels throughout the Class Period.

35. On January 25, 2007, the Surface Transportation Board ("STB"), which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007).

36. The STB also found that the railroads had been "double dipping" – applying to the same traffic both a fuel surcharge and a rate increase that is based on the RCAF or other index that includes a fuel cost component. The STB ordered Defendants to change these practices. The STB's decision addressed rate regulated rail freight traffic only (which is not the subject of this Complaint). The STB stated that its decision does not apply to rail freight traffic under contract or otherwise exempted from rate regulation.

37. Defendants applied the same unreasonable fuel surcharge practices to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

## ELEMENTS OF THE PRICE-FIXING CONSPIRACY

38. Defendants agreed to compute Rail Fuel Surcharges, not as a cost recovery mechanism for the specific transportation to which it was applied, but as a multiplier percentage of the base rate charged for the rail freight transportation. Defendants applied these surcharges not only to published tariff rates, but to private contracts, and other unregulated traffic.

39. Defendants began to implement their conspiracy at least as early as June 2003 when

10

the two western railroads, BNSF and UP (the "Western Railroads"), agreed to coordinate their prices relative to Rail Fuel Surcharges. Prior to this time, the UP carload fuel surcharge was adjusted monthly based on the West Texas Intermediate ("WTI") Crude Oil Index. The BNSF carload fuel surcharge was based on the US Department of Energy (DOE) On-Highway Diesel Fuel Price Index ("HDF"). In or about June 2003, however, the UP switched to the HDF Index pursuant to an agreement with the BNSF. From that point on, the Western Railroads moved in lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the class period.

40. The Western Railroads agreed to administer the HDF index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied. When the HDF Index exceeded $1.35 per gallon, however, the Western Railroads both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, the Western Railroads would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index.

41. The Western Railroads also coordinated when they would change their fuel surcharge. They agreed that the Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from

11

cartel pricing easily detectable.

42. The choice to use the HDF Index, and to set the trigger point at $1.35 per gallon for fuel surcharges was arbitrary. The fact that the Western Railroads both chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior. The similarities are both too precise and too comprehensive to have been arrived at independently.

43. Using the HDF index, the two Western Railroads moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

44. The chart below shows that the Fuel Surcharge Percentages charged by the Western Railroads for carload shipments varied before the class period began, but were identical starting in July 2003:

### MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS

| MONTH | BNSF | UP |
|-------|------|-----|
| Jun-02 | 1 | 0 |
| Jul-02 | 1 | 0 |
| Aug-02 | 0 | 0 |
| Sen-02 | 0 | 0 |
| Oct-02 | 1% | 0 |
| Nov-02 | 2% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2% | 2 |
| Feb-03 | 2% | 2 |
| Mar-03 | 2.5% | 2 |
| Apr-03 | 4.5% | 2 |
| May-03 | 2% | 2 |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |

| | | |
|---|---|---|
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |

45. Defendants CSX and NS, located in the east, began to implement the conspiracy in February 2004 or earlier, and KCS, located in the Midwest, agreed to join the conspiracy in June 2005 or earlier. (Defendants CSX, NS and KCS collectively are the "Eastern Railroads"). The Eastern Railroads all agreed to base their fuel surcharge programs on the average monthly price of West Texas Intermediate ("WTI") Crude Oil as published in the *Wall Street Journal.* Indeed, not only did these railroads all agree to use the WTI index (as opposed to many other available indices); once they had joined the conspiracy, they too agreed to administer the index in precisely the same way.

46. Specifically, after an initial period in which their selected WTI trigger price differed, the Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel. When that happened, Defendants' rates were increased 0.4 percent for every $1 dollar that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price.

47. The Eastern Railroads also coordinated when they would change their fuel surcharge -- two calendar months after the WTI index had adjusted, thereby adopting fuel surcharge price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same fuel surcharge percentage month after month. The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

14

48. The choice to use the WTI index for fuel surcharges was arbitrary. Also arbitrary was the decision to set the trigger point at $23 per barrel and to apply the surcharge in the second calendar month after the average price of WTI oil had changed. The fact that Defendants CSX, NS, and KCS all chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior. The similarities are too precise and too comprehensive to have been arrived at independently.

49. The net result is that there was uniformity among the Eastern Railroads in the monthly surcharge percentages they charged customers for most of the Class Period. Although KCS used different fuel surcharge percentages for certain months of the Class Period, in June 2005 it adopted the same fuel surcharge percentage used by CSX and NS and moved in lock step with them for the remainder of the Class Period. KCS has different operations and fuel consumption patterns from the larger US railroads, making it unlikely that the KCS would adopt the same fuel surcharge percentages as the other railroads absent a conspiracy. The chart below shows that the Fuel Surcharge Percentages charged by Defendants CSX and NS for carload shipments varied before the class period, but were identical starting in February 2004, and they also were identical to those of the KCS starting in June 2005, when the KCS joined the conspiracy:

## MONTHLY SURCHARGE PERCENTAGES - - EASTERN RAILROADS

| MONTH | CSX | NS | KCS |
|-------|------|-----|-----|
| Jun-03 | 2.4% | 2% | |
| Jul-03 | 2.4% | 2% | |
| Aug-03 | 3.2% | 2% | |
| Sep-03 | 3.2% | 2% | |
| Oct-03 | 3.6% | 2% | |

| | | | |
|---|---|---|---|
| Nov-03 | 2.4% | 2.0% | |
| Dec-03 | 3.2% | 2.0% | |
| Jan-04 | 3.6% | 2.0% | |
| Feb-04 | 4.0% | 2% | |
| **Mar-04** | **4.8%** | **4.8%** | |
| Apr-04 | 4.8% | 4.8% | |
| May-04 | 5.6% | 5.6% | |
| Jun-04 | 5.6% | 5.6% | |
| Jul-04 | 7.2% | 7.2% | |
| Aug-04 | 6.4% | 6.4% | |
| Sept-04 | 7.2% | 7.2% | |
| Oct-04 | 8.8% | 8.8% | |
| Nov-04 | 9.2% | 9.2% | |
| Dec-04 | 12.4% | 12.4% | 10.0% |
| Jan-05 | 10.4% | 10.4% | 10.0% |
| Feb-05 | 8.4% | 8.4% | 10.0% |
| Mar-05 | 9.6% | 9.6% | 10.0% |
| Apr-05 | 10.0% | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% | 10.0% |
| **Jun-05** | **12.4%** | **12.4%** | **12.4%** |
| Jul-05 | 10.8% | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% | 14.4% |
| Feb-06 | 14.8% | 4.8% | |
| Mar-06 | 17.2% | 7.2% | |
| Apr-06 | 15.6% | 5.6% | |
| May-06 | 16.0% | 6.0% | |
| Jun-06 | 18.8% | 8.8% | |
| Jul-06 | 19.2% | 9.2% | |
| Aug-06 | 19.2% | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% | 12.8% |

16

50.  While the fuel surcharge percentages moved uniformly, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the defendant railroads. Absent collusion, it is extremely unlikely that Defendants would independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that Defendants have moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges. In a competitive environment, free of collusion, carriers with lower fuel costs would impose a lower surcharge to obtain a competitive advantage.

## ADDITIONAL EVIDENCE OF A CONSPIRACY

51.  Apart from this direct evidence of price-fixing, "plus factors" further support the allegation that Defendants agreed to fix prices for Rail Fuel Surcharges. The rail transportation industry is marked by certain structural and other characteristics that make a price-fixing cartel feasible:

a.  The railroad industry is highly concentrated. Defendants in this case are the five remaining domestic Class I railroads following decades of mergers and consolidation. Defendants account for well over 90 percent of the nation's rail traffic. Such high concentration facilitates the possibility of a price-fixing cartel.

b.  There are significant barriers to entry into the railroad industry. To compete, railroads must invest in a vast network of tracks, stations, yards, and switching facilities. These take decades to develop, and require onerous regulatory and environmental reviews and approval. Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power. Because rail infrastructure is of minimal value for

17

other purposes, and rail networks are difficult to assemble, the fixed costs are largely sunk, creating significant entry barriers. Entry also requires that a new entrant capture a significant market share from existing carriers. Entry is thus both expensive and risky.

c. Rail Fuel Surcharges, when computed as a percentage of revenue, are highly standardized. Defendants structured their Rail Fuel Surcharges as a percentage of base rates and then published the percentages on their websites so the colluding railroads could police the conspiracy without frequent communications. Markets having uniform and homogeneous products or services are susceptible to price-fixing.

d. The railroad industry has a history of price-fixing and other anti-competitive behavior. In the first antitrust case dealing with the railroad industry, *United States v. TransMissouri Freight Ass 'n,* 166 U.S. 290 (1897), the railroad cartel argued that it must price fix or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price-fixing through establishment of "rate bureaus" and "rate making committees." Although these bodies have disappeared from the rail industry in the wake of the Staggers Act, the railroad industry has continued to engage in market manipulation, unreasonable rate practices, and other discriminatory practices against a wide spectrum of freight customers.

e. The CEO's of Defendants are all board members of the AAR, which facilitates transfer of pricing information. The AAR describes itself as "the central coordinating and research agency of the North American rail industry." Full membership, however, is available only to the seven Class I railroads operating in the United States, the five most significant of which are Defendants here (the other two Class I railroads are owned by Canadian companies).1 The AAR Board meets regularly and board members (and their staff) regularly communicate

18

between meetings.

52. Defendants have behaved as if they were in a competitive market. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told , with one exception by BNSF for a line of business only it served, by the Defendants that the Rail Fuel Surcharges were "not negotiable."

53. At or about the time Defendants agreed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly or monthly. Previously, Defendants had allowed, and often preferred, long term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point or that excluded fuel surcharges altogether.

54. Defendants made this switch even though most shippers preferred the former system in order to minimize risk. In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all Defendants raised prices and did not offer any compensation to customers for assuming additional risk.

55. Defendants sometimes stopped offering "through rates," in which a shipper would receive a single bill from either the originating shipper or the termination railroad and a single fee would be allocated among the railroads that shipped. Instead, Defendants moved to what is known in the industry as "Rule 11 pricing." Under Rule 11 pricing, where a shipment requires movement on more than one carrier, the two rates are stated separately rather than as one quote for the entire shipment. Defendants made this change as part of their conspiracy for two reasons:

19

to provide transparency as to what each railroad was charging on multiple line shipments and to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own territory.

56. Finally, demand for rail freight transportation services grew substantially during the period of the conspiracy, and yet Defendants' market shares remained relatively stable and constant. The fact that market shares did not did not fluctuate significantly during the Class Period is further indication that Defendants agreed to price fix rather than to compete for new sales.

## DEFENDANTS PROFITED FROM THE SURCHARGES

57. Because fuel surcharges are generally designed to compensate for increases in fuel costs, they should bear a relatively constant relationship to the actual cost of fuel associated with the individual movements to which they are applied. But since the beginning of the Class Period and before, Defendants have used the Rail Fuel Surcharge not as a cost recovery mechanism, but as a revenue enhancement measure. By computing the Rail Fuel Surcharge as a percentage of the base rate charged the shipper, Defendants ensured that there would be no real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge is applied.

58. Thus, the ratio of Defendants' profits to their actual fuel costs was high as a result of the concerted implementation and maintenance of the agreed-upon Rail Fuel Surcharge. Through these Rail Fuel Surcharges, Defendants realized billions of dollars in revenues during the Class Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge.

## ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

20

59. The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

    a.    The Rail Fuel Surcharges charged to Plaintiff and the Class for unregulated rail freight transportation have been fixed or stabilized at supra-competitive levels;

    b.    Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation; and

    c.    Competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

60. By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the members of the Class have sustained injury to their business or property. The injury sustained by the Plaintiff and the Class is the payment of supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## COUNT I

### (Violation Of § 1 Of The Sherman Act And 4 Of The Clayton Act)

61. Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

62. Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the

Clayton Act.

63. The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

64. Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

65. The contract, combination or conspiracy has had the following effects:

    a.    Prices charged to Plaintiff and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

    b.    Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

    c.    Competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

66. As a proximate result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury in that they have paid supracompetitive prices for Rail Fuel Surcharges applied to

unregulated rail freight transportation services during the Class Period.

**WHEREFORE**, Plaintiff prays for relief as follows:

(1)  That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be denominated as class representative, and that Plaintiffs counsel be appointed as counsel for the Class;

(2) That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(3) That Plaintiff and the Class recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiff and each and every member of the Class;

(4) That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(5) That Plaintiff and the Class recover treble damages, as provided by law;

(6) That Plaintiff and the Class recover their costs of the suit, including attorney's fees, as provided by law; and

(7) For such further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

trial as to all issues triable by a jury.

Date: February 15, 2008

Steven A. Skalet (DC Bar No. 359804)
Craig L. Briskin
MEHRI & SKALET, PLLC
1250 Connecticut Ave. NW, Suite 300
Washington, DC 20036
Telephone: (202) 822-5100
Facsimile: (202) 822-4997

Dennis G. Pantazis
Brian M. Clark
WIGGINS, CHILDS,
QUINN & PANTAZIS, LLC
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
Telephone: (205) 314-0500
Facsimile: (205) 254-1500

Robert G. Methvin, Jr.
Phillip W. McCallum
MCCALLUM, METHVIN & TERRELL, P.C.
The Highland Building
2201 Arlington Avenue South
Birmingham, Alabama 35205
Telephone: (205) 939-3006
Facsimile: (205) 939-0399

*Attorneys for Plaintiff*

24

A
08-281
PLF

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

### I (a) PLAINTIFFS

M.C. Dixon Lumber Company, Inc.

88888

### DEFENDANTS

CSX Transportation, Inc., BNSF Railway Co., Union Pacific Railroad Co., Norfolk Southern Railway Co. et al.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Barbour County
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Steven A. Skalet, Esq.
Mehri & Skalet, PLLC
1250 Connecticut Ave. NW., Suite 300
Washington, DC 20036
(202) 822-5100

Case: 1:08-cv-00281
Assigned To : Friedman, Paul L.
Assign. Date : 2/15/2008
Description: Antitrust

### II. BASIS OF JURISDICTION

(PLACE an x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ◉ 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE an x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|                                        | PTF | DFT |                                                        | PTF | DFT |
|----------------------------------------|-----|-----|--------------------------------------------------------|-----|-----|
| Citizen of this State                  | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State               | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation                                         | ○ 6 | ○ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**◉ A. Antitrust**

- ☒ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)          OR          ○ F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

5

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General** <br> ☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment** (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ **895 Freedom of Information Act** <br> ☐ **890 Other Statutory Actions** (if Privacy Act) <br><br> *(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans (excluding veterans)** |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act** <br> ☐ **720 Labor/Mgmt. Relations** <br> ☐ **730 Labor/Mgmt. Reporting & Disclosure Act** <br> ☐ **740 Labor Railway Act** <br> ☐ **790 Other Labor Litigation** <br> ☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)** <br> ☐ **443 Housing/Accommodations** <br> ☐ **444 Welfare** <br> ☐ **440 Other Civil Rights** <br> ☐ **445 American w/Disabilities-Employment** <br> ☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance** <br> ☐ **120 Marine** <br> ☐ **130 Miller Act** <br> ☐ **140 Negotiable Instrument** <br> ☐ **150 Recovery of Overpayment & Enforcement of Judgment** <br> ☐ **153 Recovery of Overpayment of Veteran's Benefits** <br> ☐ **160 Stockholder's Suits** <br> ☐ **190 Other Contracts** <br> ☐ **195 Contract Product Liability** <br> ☐ **196 Franchise** | ☐ **441 Civil Rights-Voting** (if Voting Rights Act) |

**V. ORIGIN**

◉ **1 Original Proceeding**   ○ **2 Removed from State Court**   ○ **3 Remanded from Appellate Court**   ○ **4 Reinstated or Reopened**   ○ **5 Transferred from another district (specify)**   ○ **6 Multi district Litigation**   ○ **7 Appeal to District Judge from Mag. Judge**

**VI.  CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
15 U.S.C. s. 1, Price-fixing under the Sherman Antitrust Act

**VII. REQUESTED IN COMPLAINT**   ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ unknown   Check YES only if demanded in complaint
JURY DEMAND:   YES ☒   NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☒   NO ☐   If yes, please complete related case form.

DATE  February 15, 2008   SIGNATURE OF ATTORNEY OF RECORD   _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint.  You may select only one category.  You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.